## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIC C. RAJALA,
Trustee in Bankruptcy for the Estate of
Generation Resources Holding Company,
LLC

*Plaintiff*,

vs.

Case No. 09-2482-EFM

ROBERT H. GARDNER, et al.

*Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Eric Rajala, the Trustee for the bankruptcy estate of Generation Resources Holding Company, LLC (GRHC), brought this suit against six individual defendants and numerous corporate entities. The individual defendants, officers of GRHC, formed GRHC for the purpose of developing wind farm projects in Pennsylvania. On April 28, 2008, GRHC filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code. GRHC has over $6,000,000 dollars in unpaid debts. Plaintiff asserts eighteen claims alleging that the individual Defendants formed numerous other companies in an attempt to leave GRHC with $6 million in debt while the individual Defendants and their newly created companies kept over $10 million in proceeds from the sale of the wind farm projects.

## I.  <u>Factual and Procedural Background</u>[1]

### *Parties to the Lawsuit*

Plaintiff Eric Rajala, the Trustee in Bankruptcy, represents GRHC, a Delaware limited liability company, with its principal place of business in Leawood, Kansas.

Defendants include: Robert Gardner and Robbin Gardner, husband and wife; William Stevens and Akiko Stevens, husband and wife; James and Virginia Ansel, husband and wife ("individual Defendants"). Each couple owned and controlled a one-third interest of GRHC. These individual defendants formed the following companies which are also Defendants in this lawsuit: StonyCreek Windpower; Forward Windpower, LLC; Forward Windpower Holding Company (PA and MO); Lookout Windpower, LLC; Lookout Windpower Holding Company (PA and MO); Gardner Family Investment Company, LLC; Stevens Family Investment Company, LLC; and Windforce Holdings, Inc.

Other Defendants include: Edison Mission Energy; Mission Wind Pennsylvania, Inc.; Mission Wind Pennsylvania Two, Inc; and Mission Wind Pennsylvania Three, Inc. Edison Mission Energy owns and controls the Mission Wind entities. Edison also owns Defendants Lookout Windpower, LLC and Forward Windpower, LLC now. All of these Defendant companies will be referred to as "Edison."[2]

---

[1] The Court provides this background to give context to the current motions and the current disputes. A breach of contract action occurred in the Western District of Pennsylvania, and this Court incorporates some of the facts contained in the United States District Court for the Western District of Pennsylvania's "Findings of Fact and Conclusions of Law" and "Judgment and Memorandum and Order of Court." *See* Doc. 4-3 in Case No. 11-2524, The United States District Court for the Western District of Pennsylvania's Findings of Fact and Conclusions of Law [hereinafter *Findings of Fact*] and Doc. 4-1 in Case No. 11-2524, The United States District Court for the Western District of Pennsylvania's Judgment and Memorandum and Order of Court [hereinafter *Judgment and Memorandum*]. The specific facts that the Court relies upon in deciding each motion will also be set forth in the section addressing that motion.

[2] These Defendants currently do not have any motions pending before the Court.

Finally, FreeStream Capital, LLC ("FreeStream"), a financial advisor to GRHC, is a Defendant.

## Timeline of Events

In February 2002, the individual Defendants formed GRHC for the purpose of developing wind farm projects. In early 2002, two Pennsylvania-based foundations ("Foundations") approved GRHC for a $1,000,000 loan for the purpose of developing wind power projects in Pennsylvania. The Foundations approved an additional $1,000,000 loan to GRHC in October 2002.

In early 2004, GRHC principals began discussions with Edison Capital[3] about how to further develop the wind projects and ultimately sell them to Edison Capital.

On February 28, 2005, GRHC and FreeStream entered into an Advisory Services Agreement in which FreeStream agreed to provide advisory and consultancy services with respect to a possible third-party sale of a wind energy project, entitled StonyCreek.

On July 18, 2005, GRHC and Edison Capital entered into a seventeen-page Memorandum of Understanding (MOU) in which they contemplated Edison Capital purchasing from GRHC, as the developer, three wind power projects: Stonycreek Windpower; Forward Windpower; and Lookout Windpower. The MOU contained language that it was intended as an outline only. It also contained language that the agreement would become effective as of July 18, 2005, and that it should be construed and enforced in accordance with California law.

The MOU provided certain terms of the contemplated purchase, including such items as sunk costs, development expenses, and loans. It estimated that GRHC had already incurred third-party

---

[3] The Trustee's Complaint names Edison Capital as the entity involved in the discussions with GRHC and as the party to the Memorandum of Understanding. Edison Capital, however, is not a named Defendant. Furthermore, there is no explanation as to the relationship between Edison Capital and the named Defendants Edison Mission Energy and the Mission Wind entities.

development costs and expenses with respect to the projects of approximately 4.7 million. These were defined as "sunk costs," and the MOU provided that the applicable project company would reimburse GRHC for the sunk costs applicable to each project. With respect to developer fees, GRHC, as developer, would also be entitled to developer fees which included a COD (commercial operations date) fee for each project as defined in the applicable project agreements.

In addition, the MOU set forth that the project companies would not be liable for financial obligations that GRHC had previously incurred, except with respect to the Stonycreek project where there was $2.5 million in outstanding loans payable to Berks County Community Foundations and with respect to the Forward project where there was an outstanding $230,000 loan payable to Berks County Community Foundation. There was also language addressing a note in favor of Black & Veatch.

The MOU set forth the organization of the project companies, and the parties contemplated that special purpose project companies would be organized to own the development rights for each project. GRHC and Edison Capital would enter into an "Operating Agreement" with respect to each project company. The Operating Agreement would provide that prior to the closing of construction financing, GRHC and Edison Capital would each own 50% of the project company. After the closing of construction financing, Edison Capital would make all of the capital contributions according to the terms of the Operating Agreement and would own 100% of the project company. The MOU also provided that after its execution, the parties would attempt to negotiate and finalize definitive agreements. Copies of the MOU were given to the Foundations and Black & Veatch.

In November 2005, the individual Defendants formed Lookout Windpower Holding Company (PA) ("LWHC") and Forward Windpower Holding Company (PA) ("FWHC"). On

February 3, 2006, LWHC entered into an amended and restated operating agreement ("Lookout Operating Agreement") with Mission Wind, Pennsylvania, a subsidiary of Edison. This document provided that LWHC was the developer member of the Lookout Windpower project.[4]

The Lookout Operating Agreement related to the company, Lookout Windpower, LLC. This agreement set forth the basis in which Edison would become the 100% owner of Lookout Windpower. At the time the Lookout Operating Agreement was executed, Edison became 50% owner. Upon the commencement of construction, Edison would be entitled to the remaining 50% and become 100% owner of Lookout Windpower.[5]

On March 28, 2007, LWHC entered into a redemption agreement ("Lookout Redemption Agreement") with Edison. This document also provided that LWHC was the developer of the Lookout Windpower project. The Lookout Redemption Agreement provided that on or before March 30, 2007, payments should be made in the amount of $750,000 to LWHC, the developer member, and $250,000 to FreeStream Capital.[6] It also provided that once the project achieved commercial operation, Lookout Windpower (which would then be fully owned by Edison) would pay 25% of the final installment to FreeStream as full satisfaction of all amounts that may be due to FreeStream from LWHC and/or Edison, and Lookout Windpower would pay 75% of the final installment to LWHC.

### *GRHC's Bankruptcy and the Litigation Surrounding the Windpower Projects*

On April 28, 2008, GRHC filed for bankruptcy in Kansas.

---

[4] FWHC also entered into an amended and restated operating agreement which provided that FWHC was the developer member of the Forward Windpower project.

[5] FWHC's operating agreement was similar.

[6] Those amounts were paid on March 30, 2007. *Findings of Fact*, *supra* note 1, at ¶ 18.

The Lookout Windpower project became operational on October 20, 2008.[7] Edison disputed the amount due under the Lookout Redemption Agreement and did not pay. On December 17, 2008, LWHC and FreeStream filed suit in the Western District of Missouri against Edison and its affiliates, including Mission Wind and Lookout Windpower asserting that Edison breached its contract. On April 17, 2009, the Western District of Missouri dismissed the case for lack of jurisdiction. LWHC and FreeStream then filed suit in Western District of Pennsylvania asserting the same claims against Edison.

On September 11, 2009, Eric Rajala, the Bankruptcy Trustee for GRHC, filed this lawsuit in the District of Kansas. The Trustee filed his Second Amended Complaint on October 12, 2010, asserting numerous claims.[8] Broadly stated, the Complaint includes fraud, fraudulent concealment, and negligent misrepresentation claims on the basis that the individual Defendants falsely represented that GRHC was the sole developer of three Pennsylvania windpower projects and that GRHC would be paid from the sale of those windpower projects. The Trustee also alleges fraudulent transfer claims, contending that (1) GRHC's members, the individual Defendants, used GRHC's resources to identify the Lookout and Forward development opportunities and began development of those projects; (2) then GRHC's members transferred the development and redemption opportunities to other companies owned by the members; (3) which caused GRHC to default on its loans to creditors and declare bankruptcy while GRHC's members kept the proceeds of the Forward and Lookout development projects for themselves. In addition, the Trustee alleges a breach of fiduciary duty claim against the individual Defendants and against FreeStream. With respect to the

---

[7] *Id.* at ¶ 34.

[8] Defendants previously moved to dismiss the case which the Court granted in part and denied in part. *See* Doc. 109.

individual Defendants, the Trustee contends that Defendants breached their fiduciary duties to GRHC in numerous ways, including usurping corporate opportunities from GRHC. As to FreeStream, the Trustee alleges that FreeStream breached its fiduciary duty to GRHC by allowing the windpower project to go forward in LWHC's name instead of GRHC's name. Finally, the Trustee's equitable reformation/rescission claim against all Defendants seeks to reform the Lookout Operating and Redemption Agreements by substituting GRHC's name as the developer in those agreements instead of LWHC's name as the developer.

In early May 2011, the Trustee filed a motion in this Court seeking to stop the Pennsylvania bench trial between LWHC, FreeStream, and Edison, scheduled for May 27, 2011. The Trustee argued that the money sought in the Pennsylvania action was property of the GRHC bankruptcy estate. This Court denied the Trustee's motion finding that it did not have jurisdiction to stay the case in the Western District of Pennsylvania.[9]

The Pennsylvania court held its bench trial on May 27, 2011. On May 31, 2011, the Pennsylvania court entered its Findings of Fact and Conclusions of Law and its Judgment and Memorandum and Order of Court. It determined that Edison had breached the Lookout Redemption Agreement by failing to pay LWHC and FreeStream and owed $8,941,448.46, inclusive of prejudgment interest. The Pennsylvania court found that LWHC was due 75% of the judgment and FreeStream was due 25% of the judgment. In addition, the Pennsylvania court transferred the issue of whether the monetary judgment was part of the bankruptcy estate to the Bankruptcy Court in the District of Kansas.

---

[9] Doc. 129.

Edison deposited the money into the Bankruptcy Court's Registry. LWHC then filed a motion to withdraw the reference from the Bankruptcy Court to this Court on the issue relating to the Pennsylvania judgment funds.[10] The Trustee did not respond to LWHC's motion, and the Bankruptcy Court recommended that this Court withdraw the reference.[11] Accordingly, this Court granted the bankruptcy withdrawal, and the case was converted to a civil case and designated the case number of 11-2524.

From July 2011 through December 2011, the parties filed numerous motions in both Case No. 09-2482, the case filed with this Court, and in Case No. 11-2524, the converted civil case that was withdrawn from the Bankruptcy Court. In December 2011, these two cases were consolidated.[12]

This Order addresses: FreeStream's Motion to Distribute (Doc. 4 in Member Case 11-2524); Lookout Holding's Motion to Distribute (Doc. 9 in Member Case 11-2524); Individual/LWHC's Motion for Judgment on Pleadings (Doc. 144); Individual Defendants' Motion for Summary Judgment (Doc. 147); FreeStream's Motion for Summary Judgment on Count 18 (Doc. 183); and FreeStream's Motion for Summary Judgment on Count 11 (Doc. 195). All motions are fully briefed. The Court will address each motion in turn.

## II.  Motions for Distribution of Funds

The Court will briefly set forth the background of the judgment funds pertinent to these motions.[13] On May 27, 2011, the District Court for the Western District of Pennsylvania heard

---

[10] FreeStream joined in the motion.

[11] *See* Doc. 1-2 in Case No. 11-mc-00226-EFM.

[12] Doc. 193 in Case No. 09-2482.

[13] With respect to FreeStream's motion and the Trustee's response to FreeStream's motion, the parties attached the documents that they relied upon. That is, they attached the Western District of Pennsylvania's Findings of Fact and Conclusions of Law; the Western District of Pennsylvania's Judgment and Memorandum and Order; the MOU, the

LWHC's and FreeStream's breach of contract action against Edison. In that case, the contracts at issue were the Lookout Operating and Redemption Agreements between LWHC and Edison, and the court made its decision by looking at and interpreting those agreements.[14] On May 31, 2011, the District Court for the Western District of Pennsylvania found that Edison breached its contract with LWHC and FreeStream when it failed to timely pay the final installment.

After making deductions contained in the Redemption Agreement, the Pennsylvania court determined that the final installment due from Edison to LWHC and FreeStream was $7,610,098.26.[15] With prejudgment interest of $1,331,350.20, the total damages equaled $8,941,448.46 with 75% of the judgment award in favor of LWHC and 25% of it in favor of FreeStream.[16] The court found that FreeStream was entitled to enforce the Redemption Agreement as a third party beneficiary.[17] Edison deposited the money in the Bankruptcy Court's Registry pursuant to the Pennsylvania court's direction that the Kansas Bankruptcy Court determine whether the monetary judgment was part of GRHC's estate.

In the case filed with this Court,[18] the Trustee alleges that the individual Defendants engaged in fraudulent transfers. Very broadly, the Trustee alleges that GRHC's members used GRHC's

---

Lookout Amended Operating Agreement; and the Lookout Redemption Agreement.

    With respect to LWHC's Motion to Distribute, LWHC failed to attach the Western District of Pennsylvania's Judgment and Memorandum and Order although it indicated that it was attached as Exhibit A. The Court has a copy of this exhibit because FreeStream attached it to its motion, and the Pennsylvania court sent a courtesy copy to this Court when it entered its Judgment.

[14] *Findings of Fact, supra* note 1, at ¶ 56.

[15] *Id.* at ¶ 60.

[16] *Id.* at ¶¶ 63-64.

[17] *Id.* at ¶ 55.

[18] *See* Doc. 100 in Case No. 09-2482.

resources to identify windpower development opportunities and then GRHC's members transferred those opportunities to other companies owned by the members which caused GRHC to default on its loans and declare bankruptcy. More specifically, the Trustee contends that GRHC's members entered into a MOU with Edison Capital, and the MOU specified that GRHC was the developer of all three windpower projects. The subsequent documents, including the Lookout Operating and Redemption Agreements, named LWHC as the developer of the Lookout windpower project. The Trustee asserts that GRHC should have been named the developer in those subsequent agreements, instead of LWHC, and that GRHC is the real party entitled to the payment from Edison under the agreements. Because LWHC was named as the developer, the Trustee contends that the individual Defendants fraudulently transferred the windpower project away from GRHC to LWHC.

Both FreeStream and LWHC now request this Court to distribute their portion of the Pennsylvania monetary judgment being held in the Bankruptcy Court. Both parties argue that the judgment funds are not property of GRHC's bankruptcy estate. The Court will first address FreeStream's Motion to Distribute and then address LWHC's Motion to Distribute.

## A.  FreeStream's Motion to Distribute (Doc. 4 in Case No. 11-2524)

FreeStream argues that the Court should distribute its portion (25%) of the money currently held in the bankruptcy court registry because it is not property of the GRHC bankruptcy estate, and GRHC will never be entitled to it.

The Trustee contends that the money is bankruptcy estate property and should not be distributed because FreeStream's portion of the judgment is part of the "purchase price" of the wind farm projects. The Trustee argues that the true developer of the wind farm projects is GRHC. He argues that Edison pays GRHC under the MOU, the Lookout Operating Agreement, and the Lookout

Redemption Agreement. Then, the Trustee contends that GRHC pays FreeStream pursuant to an Advisory Services Agreement between GRHC and FreeStream.[19]

The Trustee's argument is unsupported and directly contrary to the written agreements and the Pennsylvania court's findings. FreeStream's payment, as the Western District of Pennsylvania noted, is pursuant to the Lookout Redemption Agreement.[20] There is no indication that the Pennsylvania court ever considered the terms of the MOU or the Advisory Services Agreement when it determined that Edison breached the Lookout Operating and Redemption Agreements. The payment structure in the Lookout Redemption Agreement provides:

> Lookout shall pay, subject to adjustment as provided below, $10,507,000 (the "Final Installment") as follows: (i) 25% of the Final Installment to FreeStream Capital LLC, as full satisfaction of all amounts that may be due to FreeStream Capital LLC from Lookout, Developer Member and/or Investor Member, and (ii) 75% of the Final Installment to Developer Member.[21]

This language makes clear that FreeStream's portion comes directly from Lookout. Lookout is now a fully owned Edison entity; thus, FreeStream's payment comes from Edison and does not pass through the Developer Member. To accept the Trustee's argument that FreeStream's portion comes from GRHC would mean that the Court would have to change the Developer Member to GRHC even though the Lookout Redemption Agreement states that LWHC is the Developer Member. The

---

[19] Although copies of the MOU, Lookout Amended Operating Agreement, and Lookout Redemption Agreement were provided with the briefing related to FreeStream's motion, no party provided a copy of the Advisory Services Agreement. Therefore, the Trustee's assertion as to FreeStream's payment under the Advisory Services Agreement is unsupported.

[20] The specific parties to the Lookout Redemption Agreement are Mission Wind Pennsylvania as the Investor Member, and LWHC, as the Developer Member. Mission Wind Pennsylvania and LWHC are the sole members of Lookout Windpower, LLC. For simplicity, the Court will refer to "Mission Wind Pennsylvania" as Edison because it is fully owned by Edison. Furthermore, the Court will refer to "Lookout Windpower" as Edison because Edison is now the sole owner of the Lookout Windpower entity.

[21] Doc. 8-6 in Case No. 11-2524, Lookout Redemption Agreement, p. 2.

Court would also have to re-write the payment structure to provide 100% of the Final Installment to go to GRHC. This interpretation is contrary to the documents and to the Pennsylvania court's findings of fact. FreeStream's 25% of the final installment comes directly from an Edison entity and does not come from or pass through the Developer Member, whether it be LWHC or GRHC. Thus, FreeStream's 25% of the final installment cannot be part of GRHC's estate because GRHC would never be entitled to the installment.

Furthermore, even though the Trustee alleges fraudulent-transfer claims against LWHC, the Trustee does not assert any fraudulent transfer claims against FreeStream. FreeStream, therefore, could not have participated in any alleged fraudulent transfers. Consequently, the analysis of whether a fraudulent transfer claim is part of the bankruptcy estate does not affect FreeStream.[22]

The Trustee provides no factual or legal basis as to why FreeStream's portion of the monetary judgment should not be distributed.[23] Because the Trustee cannot establish that FreeStream's portion of the monetary judgment is property of GRHC's bankruptcy estate, the Court grants FreeStream's Motion to Distribute.

### B.  LWHC's Motion for Distribution (Doc. 8 in Case No. 11-2524)

#### 1. Procedural Arguments

Before addressing the substantive issues of LWHC's Motion to Distribute, the Court will

---

[22] The Court will discuss whether a fraudulent transfer claim, and the subject of the fraudulent transfer claim, is part of the bankruptcy estate in detail with respect to LWHC's motion. *See infra* Section II(B)(2)(a).

[23] Presumably, the Trustee contends that the monetary judgment is part of the bankruptcy estate pursuant to 11 U.S.C. § 541 as property of the estate, and that the bankruptcy code's automatic stay provision, 11 U.S.C. § 362, applies to stop the distribution of the money. The Trustee, however, failed to cite to either of these provisions in his response to FreeStream's motion for distribution. The Court makes this assumption that the Trustee relies on these bankruptcy provisions because the parties were before this Court on a similar matter when the Trustee sought to stay the Pennsylvania action by arguing that the breach of contract suit between LWHC, FreeStream, and Edison involved estate property pursuant to 11 U.S.C. § 541(a), and the bench trial should be stayed pursuant to 11 U.S.C. § 362(a). *See* Docs. 119, 120, 126, 127, 128, and 129 in Case No. 09-2482.

address several of the Trustee's procedural arguments.[24] The Trustee first argues that any party seeking the Bankruptcy Court's determination of property of the estate must file an adversary proceeding under Bankruptcy Rule 7001. This case is in a unique procedural position, in part because the Trustee chose to file his Second Amended Complaint containing the fraudulent transfer claims in this Court rather than in the Bankruptcy Court. In addition, the bankruptcy reference was withdrawn with regard to whether the Pennsylvania judgment was property of the bankruptcy estate. Although this Court will need to consider bankruptcy law with respect to this motion, bankruptcy procedural rules are inapplicable.

Next, the Trustee attached a proposed Amended Complaint with his response, asserting that he needed a framework in which to analyze the legal issues for the motion. The Court, however, denied the Trustee's Motion for Leave to File the Amended Complaint.[25] Therefore, the Trustee's reliance on allegations in the proposed Amended Complaint is improper. The Court will look to the allegations in the Second Amended Complaint in Case No. 09-2482 when deciding LWHC's Motion to Distribute.[26]

Finally, the Trustee categorizes LWHC's motion to distribute as a motion to dismiss and applies Bankruptcy Rule 7012(b). Again, district court rules apply here. Furthermore, the Court disagrees with the Trustee's categorization of LWHC's motion because a decision to distribute the funds will not dispose of Trustee's claims. Accordingly, LWHC's motion to distribute cannot be categorized as a motion to dismiss.

---

[24] The Trustee did not assert these procedural arguments with respect to FreeStream's Motion to Distribute.

[25] Doc. 191.

[26] Doc. 100 in Case No. 09-2482. As noted above, the Court consolidated Case No. 09-2482 and Case No. 11-2524.

### 2. Substantive Arguments

Turning to the substantive arguments, LWHC contends that its portion of the Pennsylvania judgment funds currently held in the Bankruptcy Court's Registry should be distributed. The Trustee asserts two arguments as to why the Pennsylvania monetary judgment is estate property under 11 U.S.C. § 541 and should not be distributed: (1) the judgment funds are the result of a fraudulent transfer, and (2) GRHC has a vested legal interest in those judgment funds. The Court will address each argument in turn.

#### a. Fraudulent Transfer

First, the Trustee asserts fraudulent transfer claims in his Second Amended Complaint against the individual Defendants and their related companies.[27] As noted above, the Trustee contends that the individual Defendants transferred the Lookout development and redemption opportunities to other companies owned by the individual Defendants. Thus, the Trustee contends that the individual Defendants engaged in a fraudulent transfer. The Trustee then contends that property subject to a fraudulent-transfer claim is property of the bankruptcy estate. LWHC disagrees and contends that even if the Pennsylvania judgment funds are the result of a fraudulent transfer from GRHC to LWHC, the judgment funds are not property of GRHC's estate unless and until the Trustee successfully prevails on his alleged fraudulent transfer claims.

The parties do not dispute that a fraudulent-transfer cause of action is considered property of a bankruptcy estate.[28] They disagree as to whether the property of a fraudulent-transfer cause of

---

[27] LWHC also has a Motion for Judgment on the Pleadings in which it asserts that the Trustee fails to state a fraudulent transfer claim. That motion will be addressed elsewhere in this Order. *See infra* Section III(C)(3).

[28] *See Sender v. Buchanan* (*In re Hedged-Investment Assocs. Inc.*), 84 F.3d 1281, 1285 (10th Cir. 1996) ("Causes of action belonging to the debtor fall within [the definition of § 541].")

action is property of the bankruptcy estate prior to an adjudication being made on whether a fraudulent-transfer occurred. Courts are divided on this issue, and neither the Tenth Circuit nor the Tenth Circuit Bankruptcy Appellate Panel have issued an opinion.[29]

Pursuant to 11 U.S.C. § 541(a)(1), a bankruptcy estate consists of all of the debtor's legal or equitable property interests that existed as of the commencement of the bankruptcy case, subject to a few exceptions. The scope of section 541 is broad and construed generously.[30]

In *American National Bank of Austin v. MortgageAmerica Corp.* (*In re MortgageAmerica Corp.*),[31] the Fifth Circuit read section 541(a)(1) expansively and determined that a debtor retained a continuing equitable interest in the property that was fraudulently transferred.[32] Thus, the Fifth Circuit found that the equitable interest in the fraudulently-transferred property was property of the estate, and the automatic stay provision under section 362(a) of the Bankruptcy Code was applicable preventing a third party from pursuing a fraudulent transfer action.[33]

The Second Circuit, however, in *FDIC v. Hirsch* (*In re Colonial Realty Co.*,),[34] rejected *MortgageAmerica's* holding. The Second Circuit reasoned that to allow alleged fraudulently-

---

[29] *See, e.g., In re Silver*, 303 B.R. 849, 864, n.62 (10th Cir. B.A.P. 2004) ("[W]e need not decide whether property subject to an avoidance action is property of the estate.").

[30] *See Parks v. Dittmar* (*In re Dittmar*), 618 F.3d 1199, 1207 (10th Cir. 2010).

[31] 714 F.2d 1266 (5th Cir. 1983).

[32] *Id.* at 1275.

[33] *Id.* The Sixth Circuit relied on *MortgageAmerica* when it later stated that "property fraudulently conveyed and recoverable under Bankruptcy Code provisions remains property of the estate and, if recovered, should be subject to equitable distribution under the Code." *Nat'l Labor Relations Bd. v. Martin Arsham Sewing Co.*, 873 F.2d 884, 887 (6th Cir. 1989). The Bankruptcy Court in the Western District of Michigan, however, questioned whether the Sixth Circuit actually followed *MortgageAmerica* because it found the Sixth Circuit's language in *Martin Arsham Sewing Co.* equivocal. *In re Teleservices Group, Inc.*, 463 B.R. 28, 34 n.18 (Bankr. W.D. Mich. 2012).

[34] 980 F.2d 125 (2d Cir. 1992).

transferred property to be part of the estate under section 541(a)(1) *prior to its recovery* would conflict with section 541(a)(3), which provides that property of the bankruptcy estate includes any interest in property that the trustee *recovers*.[35] Accordingly, the Second Circuit found that alleged fraudulently-transferred property was not property of the bankruptcy estate under section 541(a)(1).[36] Several bankruptcy courts have adopted the Second Circuit's rationale as the better approach.[37]

Although these cases do not fit the facts of our case,[38] they are instructive. This Court finds more persuasive the Second Circuit's reasoning that fraudulently-transferred property is not part of the bankruptcy estate until it is recovered because there has been no determination that the underlying property was in fact fraudulently transferred. The Court recognizes that the scope of property under § 541(a)(1) is broad and that the Trustee retains the fraudulent-transfer causes of action as property of the estate. But as one court noted: "Until a judicial determination has been made that the property was, in fact, fraudulently transferred, it is not property of the estate."[39]

---

[35] *Id.* at 131 (citing *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989)).

[36] *Id.* The Second Circuit still stayed the third-party fraudulent transfer litigation, but it did so under a different Bankruptcy Code provision, section 362(a)(1). *Id.* at 132. That provision is not relevant to this case.
    The Fourth Circuit noted the divide in the circuits, but did not definitely adopt either the Fifth or Second Circuit's position. *See French v. Liebmann (In re French)*, 440 F.3d 145, 152 n. 2 (4th Cir. 2006).

[37] *See In re Loeffler*, 2011 WL 6736066, at *3 (Bankr. D. Colo, Dec. 21, 2011) ("Simply put, no matter how compelling the case appears, a transfer is not a fraudulent conveyance until it as adjudicated as such. Proceeds of such avoidance actions do not become estate property until actually recovered by the trustee."); *In re Fehrs*, 391 B.R. 53, 70-72 (Bankr. D. Idaho 2008) (finding that the Second Circuit's approach was preferable to *MortgageAmerica*); *Klingman v. Levinson*, 158 B.R. 109, 112-13 (N.D. Ill. 1993) (finding the Second Circuit's rationale more persuasive than *MortgageAmerica's* rationale).

[38] The majority of the courts addressing the property of the estate issue do so in the context of third-party fraudulent transfer litigation. Generally, a creditor brings a fraudulent transfer claim against the debtor (or debtor's principals) alleging that the debtor fraudulently transferred assets. The bankruptcy trustee requests a stay by arguing that fraudulent-transfer claims are part of the bankruptcy estate. When deciding whether the third-party fraudulent transfer litigation should be stayed, courts consider what constitutes estate property.

[39] *In re Saunders*, 101 B.R. at 305.

-16-

In this case, a complicated path remains to the determination that the judgment funds are the subject of a alleged fraudulent transfer. The funds are being held in the Kansas Bankruptcy Court pursuant to the Western District of Pennsylvania Court's judgment. The Pennsylvania court determined that Edison breached the Lookout Operating and Redemption Agreement with LWHC and FreeStream. No party brought a fraudulent transfer cause of action in the Western District of Pennsylvania. Instead, it was a breach of contract action between LWHC and FreeStream against Edison, all of whom are non-debtors. Furthermore, GRHC was not a party to either the Lookout Operating or Redemption Agreements between Edison and LWHC. And the Trustee will have to demonstrate that the principals of GRHC fraudulently transferred its interest to LWHC. If the Trustee prevails on his fraudulent transfer claims, he then has the remedy of avoiding the fraudulent transfer and bringing it into GRHC's bankruptcy estate. Until there is an adjudication that a fraudulent transfer occurred, however, the Trustee has no basis to assert that LWHC's judgment funds pursuant to its contract with Edison are property of GRHC's bankruptcy estate. Accordingly, the judgment funds are not estate property pursuant to section 541(a)(1) until the Trustee demonstrates that a fraudulent transfer occurred that would encompass those judgment funds.

### b. *Rights under the MOU*

The Trustee next argues that the judgment funds are bankruptcy estate property because the MOU, between GRHC and Edison Capital vested GRHC with a property interest under section 541(a)(1). As noted above, the Trustee argues that the MOU between GRHC and Edison Capital governs the subsequent Lookout Operating and Redemption Agreements between LWHC and Edison and that GRHC should be named as the developer member in those agreements. Thus, the Trustee contends that GRHC's property interest includes the right to be paid the developer's fee

described in the Lookout Redemption Agreement.[40]

The Trustee relies on a recent Tenth Circuit case, *Parks v. Dittmar* (*In re Dittmar*)[41] for support that GRHC had a legal or equitable interest in the right to be paid the developer's fee. The *Parks* holding, however, appears inapplicable to the facts of this case because the documents in this case do not appear similar to the documents in *Parks*.[42] In *Parks*, there was only a collective bargaining agreement, executed prior to bankruptcy, that gave the debtors a contingent interest in subsequent stock appreciation rights. The documents memorializing the stock appreciation rights, however, were not executed prior to bankruptcy.[43] In addition, the payment event that entitled the debtors to the stock appreciation rights did not occur prior to bankruptcy.[44] Subsequent to the debtors' bankruptcies, the documents were memorialized and the payment event occurred entitling the debtors to the stock appreciation rights.[45] The Tenth Circuit found that the debtors had a contingent interest, based on the collective bargaining agreement, to the stock appreciation rights.[46] Thus, the stock appreciation rights were considered estate property.[47]

---

[40] This is completely apart from the Trustee's fraudulent-transfer theory.

[41] 618 F.3d 1199 (10th Cir. 2010).

[42] *Id.* at 1203. Although the parties make comparisons between the MOU in this case and the Collective Bargaining Agreement in *Parks*, neither party attached the documents to their briefs. The Court, however, looked to the allegations contained in the Second Amended Complaint as to whom the parties to the agreements are in the MOU, Lookout Operating Agreement, and Lookout Redemption Agreement. The Court also considered the timing of these agreements.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.* at 1209.

[47] *Id.* at 1209-10.

In this case, there was a Memorandum of Understanding executed pre-bankruptcy. A MOU and a collective bargaining agreement are vastly different. However, even if the MOU could be akin to a collective bargaining agreement, other definitive documents were executed in this case prior to GRHC's bankruptcy, unlike in *Parks*. The Lookout Operating and Redemption Agreements were executed almost two years prior to GRHC's bankruptcy, and these documents named LWHC as the developer. GRHC was not a party to the Lookout Operating and Redemption Agreements. For that reason, it does not appear that GRHC could hold a contingent interest in the payment under the Lookout Operating and Redemption Agreements, which supersede the MOU. Accordingly, the Trustee fails to demonstrate that GRHC had a legal or equitable interest in the developer's fee.[48]

The Trustee has not provided a legal basis to stay the distribution of the judgment funds. Thus, the Court grants LWHC's Motion to Distribute.

### III.  Certain Defendants' Motion for Judgment on the Pleadings (Doc. 144)

#### A. *Factual Background*

In the Second Amended Complaint, the Trustee asserts numerous claims against the individual Defendants and their respective business entities. The Trustee alleges that the individual Defendants engaged in fraud, fraudulent concealment, and negligent misrepresentation. With respect to these three claims, the Trustee contends that the individual Defendants falsely represented that GRHC was the sole developer of the three Pennsylvania windpower projects and that the outstanding loans to GRHC would be paid from the sale of these windpower projects. Subsequent

---

[48] Again, presumably, the Trustee intended to invoke the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362, to stay the distribution of the judgment funds if those funds were considered estate property. However, he never cited to this provision but simply argued that the money was property of the estate and opposed the distribution. Even in the previous briefing to this Court relating to staying the Pennsylvania bench trial, the Trustee never cited to the specific provision of section 362(a) that he deemed applicable. Presumably, because he repeatedly argues that the money is *property* of the estate, he relies on section 362(a)(3) which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

to these representations, GRHC's members created several other companies, including LWHC. Edison entered into the Lookout Operating and Redemption Agreements with LWHC as the named developer of the Lookout windpower project. These agreements entitled LWHC to the proceeds of the sale of the Lookout windpower project. The Trustee contends that GRHC is entitled to this money because GRHC was the true developer of the project.

As to the Trustee's fraudulent transfer claims, he alleges that (1) GRHC's members, the individual Defendants, used GRHC's resources to identify the Lookout and Forward development opportunities and began development of those projects; (2) then GRHC's members transferred the development and redemption opportunities to other companies owned by the members; (3) which caused GRHC to default on its loans to creditors and declare bankruptcy while GRHC's members kept the proceeds of the Forward and Lookout development projects for themselves. The Trustee's equitable reformation claim seeks to reform the Lookout Operating and Redemption Agreements by substituting GRHC as the developer instead of LWHC.

The individual Defendants and their respective business entities filed a Motion for Judgment on the Pleadings on the above listed counts that were alleged against them. They argue that Defendants are entitled to judgment as a matter of law on the fraud claims (Counts 2, 3, and 4)[49] because (1) the Trustee does not have standing to pursue the fraud claims on behalf of the creditors, and (2) GRHC, as debtor, cannot bring a fraud claim because the individual Defendants, as sole members of GRHC, cannot have defrauded themselves. Defendants also assert if Counts 2, 3, and 4 fail, Count 11 must be dismissed because it is based on the alleged underlying fraud. Finally, Defendants contend that they are entitled to judgment as a matter of law on the fraudulent transfer

---

[49] Count 2 is a negligent misrepresentation claim; count 3 is a fraud claim; and count 4 is a fraudulent concealment claim. These claims were only brought against the individual Defendants.

claims (counts 5 through 10) because the Trustee only alleged a usurpation of a corporate opportunity and a usurpation of a corporate opportunity does not constitute a fraudulent transfer. The Court will address each contention.

### B.  Judgment on the Pleadings Standard

Responsive pleadings have already been filed, and Defendants' motion is brought pursuant to Fed. R. Civ. P. 12(c) rather than Fed. R. Civ. P. 12(b)(6).[50] To survive a motion to dismiss for failure to state a claim upon which relief can be granted, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face."[51]  Under this standard, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[52]

### C.  Analysis

#### 1.    Fraud Claims (Counts 2, 3, and 4)

First, Defendants argues that the Trustee lacks standing to bring these claims because he cannot bring fraud claims on behalf of the creditors and GRHC cannot defraud itself. A trustee in bankruptcy draws his authority to assert a particular cause of action from the provisions of the Bankruptcy Code.[53] "Causes of action commenced by a trustee on behalf of a debtor estate fall into

---

[50] This is a distinction without a difference as the standard is the same under Rule 12(c) and Rule (12)(b)(6). *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003).

[51] *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).

[52] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[53] *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996).

two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers."[54] Here, the Trustee asserts that he is pursuing estate property under section 541. "[T]o satisfy the requirements of § 541, the cause of action asserted by the trustee must belong to the debtor entity itself, not the debtor's creditors individually."[55] "State law provides the guidelines for determining whether a cause of action belongs to the debtor and therefore becomes property of the estate."[56] When the Trustee asserts claims under the authority of section 541, the trustee takes no greater rights than the debtor itself had because the trustee "stands in the shoes of the debtor."[57] And the Trustee is "subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor."[58]

### a.  *General versus Personal Claims*

Generally, a trustee lacks standing to pursue personal claims of creditors.[59]  Several courts, in discussing whether a trustee has standing to pursue an alter ego action, have determined that a trustee can sometimes bring a claim on behalf of the debtor corporation if it is a general claim applicable to all creditors, and state law allows the claim.[60] To determine whether the cause of action

---

[54] *Id.*

[55] *Id.* at 1305 (citations omitted).

[56] *Id.* (citations omitted).

[57] *Id.* (quotation and citation omitted).

[58] *Id.* (quotation and citation omitted).

[59] *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972).

[60] *See, e.g.*, *In re Icarus Holding, LLC*, 391 F.3d 1315, 1319-20 (11th Cir. 2004) (considering whether a bankruptcy trustee could bring an alter ego action by determining whether the alter ego action was a personal action of the creditors or a general one to creditors); *see also Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348-49 (7th Cir. 1987) (determining whether creditors could bring an alter ego action by considering whether the claim was

is applicable to all creditors, these courts consider whether it is a general or personal claim. "A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause."[61] However, "[i]f the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim."[62] A court will look to the injury for which relief is sought to determine whether the action is personal to the party alleging the cause of action or whether it is an action common to the corporation and creditors.[63] "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate."[64]

Although there are no alter ego claims in this case, both parties cite to the above case law for the proposition that the Court must consider whether the Trustee's fraud claims are general to all creditors or whether they are personal claims of a creditor to decide whether the Trustee has standing to bring these claims.[65] Because the parties agree upon this approach, and because the Court finds that this approach is helpful in determining the issue ,the Court will adopt this approach in evaluating the fraud claims in this case.

The parties, however, disagree as to the outcome of whether the claims are general to all creditors or personal to specific creditors with both parties employing different reasoning to reach

_____

a general or personal claim).

[61] *Koch Ref*, 831 F.2d at 1348.

[62] *Id.* at 1349.

[63] *Id.* at 1349.

[64] *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994).

[65] *See* Doc. 145, p. 6; Doc. 172, pp. 9-10; Doc. 175, p. 4.

their result. Defendants contend that the fraud claims are personal tort claims, citing to several cases which provide that fraud claims are non-assignable in Kansas.[66] The Trustee primarily focuses on the damages claimed in the Second Amended Complaint.[67] This is of little assistance as the total damages alleged will presumably always benefit all creditors, and the total damages do not demonstrate whether the actual claims are specific or personal to the creditors of GRHC. Irrespective of the alleged total damages, the Court must consider the scope of the Trustee's fraud allegations and the injury resulting from the allegations of fraud.

Adopting the principles from the above cited cases to the fraud claims alleged in this case, the Court will consider whether the underlying claim is a general claim that would benefit all creditors or a claim that seeks redress of a specific injury to a particular creditor and whether Kansas would allow the claim. The alleged injury from the negligent misrepresentation, fraud, or fraudulent concealment is that GRHC did not receive any of the $10.5 million Redemption payment. This alleged injury is not specific to any one creditor, nor specific to any misrepresentation to any creditor. As the Trustee noted at oral argument, the fraud allegations relate to the individual Defendants fraudulently switching the identity of the developer in the agreements which would not be a claim that a specific creditor could assert.[68] Although the injury appears to be general to creditors, the Court must go on to consider whether Kansas law would allow the Trustee to bring it on behalf of creditors.

---

[66] *See* Doc 145, p.6-7 ; Doc. 175, p. 11.

[67] The Trustee's arguments are difficult to follow.

[68] The creditors' claims would be specific to the amount they claim due to them and the specific misrepresentations made to defraud them.

As noted above, tort claims are not assignable in Kansas.[69] Moreover, the Court notes that fraud requires an untrue statement upon which another party justifiably relies upon and acts to his detriment.[70] This requirement is necessarily personal to the specific individual to whom the false statement was made. Here, with respect to the fraud and negligent misrepresentation claims, the Trustee alleged that the individual Defendants made certain misrepresentations intending GRHC and "others" to rely upon on those misrepresentations. The Trustee also alleged that GRHC and "others" relied upon those misrepresentations. But the "others" are never specifically identified in the Second Amended Complaint as creditors of GRHC.[71] Nor are the specific misrepresentations to specific creditors identified in the Second Amended Complaint. Because specific misrepresentations and specific creditors are not identified in the Second Amended Complaint, it does not appear that these claims encompass specific creditors. Instead, the Trustee's claims appear to be specific to GRHC itself. Accordingly, the Court concludes that although the recovery may benefit all creditors, these fraud claims are not general claims that GRHC could assert on behalf of creditors. Instead, the fraud claims are specific to GRHC, and only GRHC itself can assert the fraud claims against the individual Defendants.

### b. In Pari Delicto

Because the Court concludes that the fraud claims are brought on behalf of GRHC and are not specific and personal claims of any creditor of GRHC, the Court must address whether the Trustee can bring these claims on behalf of GRHC against the individual Defendants. The Trustee

---

[69] See Snider v. MidFirst Bank, 42 Kan. App. 2d 265, 271, 211 P.3d 179, 184 (2009); see also Wade v. EMCASCO Ins. Co., 483 F.3d 657, 675 (10th Cir. 2007).

[70] See Alires v. McGehee, 277 Kan. 398, 403, 85 P.3d 1191, 1195 (2004).

[71] The Court notes that with respect to the fraudulent-concealment claim, the Trustee asserts that GRHC and "its creditors" relied upon the individual defendants to communicate material facts. The creditors are not identified.

stands in the shoes of GRHC and is therefore subject to the same defenses as if GRHC itself had asserted the cause of action.[72] Defendants contend that the Trustee cannot bring these fraud claims against the individual Defendants because the Individual Defendants, as sole members of GRHC, could not have defrauded themselves. As a practical matter, this argument makes sense because the individual Defendants could not have made false statements or misrepresentations to themselves and relied upon those false statements because they would have known that they were false statements. Accordingly, the individual Defendants could not have defrauded themselves because they could not have reasonably relied on any false statements made to themselves.

The Trustee does not address Defendants' contention that the individual Defendants could not have made misrepresentations to themselves but instead argues that Defendants are attempting to invoke the defense of *in pari delicto*. The Trustee contends that an exception to the *in pari doctrine* is applicable to the facts of this case. Defendants respond by asserting an exception to the exception.

The doctrine of *in pari delicto* provides that "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one."[73] Generally, the doctrine of *in pari delicto* bars a plaintiff who participated in the wrongdoing from recovering damages resulting from the wrongdoing.[74] "When that wrongful conduct is perpetrated by a debtor who subsequently files for bankruptcy, courts have held that the defense of *in pari delicto* is available in an action by a bankruptcy trustee against another party pursuant to 11 U.S.C. § 541(a)(1) if the defense could have

---

[72] *Sender*, 84 F.3d 1305.

[73] *Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1275 (10th Cir. 2008) (citation and quotation omitted).

[74] *Id.* at 1275. In this opinion, the Tenth Circuit discussed the *in pari delicto* doctrine in the context of a defense.

been raised against the debtor."[75] Thus, *in pari delicto* bars a trustee from bringing suit on behalf of the corporation against the third party because the debtor corporation's officers engaged in the fraud with that third party. This is so because the trustee stands in the shoes of the debtor and takes no greater rights than the debtor itself. In this case, it would bar the Trustee, standing in the shoes of GRHC, from recovering from a wrong that GRHC itself took part of. The facts are slightly different, however, because GRHC as the debtor corporation asserts claims against GRHC's officers for fraud against GRHC.

As an initial matter, the Trustee argues in a footnote that the *in pari delicto* doctrine is an affirmative defense that the Defendants did not plead, and it is not at issue right now. Defendants contend that although *in pari delicto* is generally an affirmative defense under state law, in the bankruptcy context, some federal courts have considered it in conjunction with standing. Suffice it to say, there is not uniformity by courts in approaching standing and the doctrine of *in pari delicto*.[76]

The Second Circuit considers the *in pari delicto* doctrine a component of standing.[77] Other circuits, however, find that *in pari delicto* is an equitable defense apart from whether the trustee has standing to bring the claim.[78] The conclusions from both approaches, however, are the same in that *in pari delicto* bars the trustee from asserting a claim against a third party because the trustee cannot assert a claim on behalf of a corporation when that corporation's members engaged in the fraud.

---

[75] *Id.* (internal quotations and citations omitted).

[76] *See* John T. Gregg, *The Doctrine of In Pari Delicto: Recent Developments,* 2006 Norton Annual Survey of Bankruptcy Law Part I § 5.

[77] *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F. 2d 114, 118-19 (2nd Cir. 1991).

[78] *See Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152-53 (11th Cir. 2006); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 346-47 (3d Cir. 2001).

In *In re Hedged-Investments Assocs.*,[79] the Tenth Circuit addressed whether the *in pari delicto* doctrine precluded a bankruptcy trustee from asserting certain claims against third parties. The trustee argued that he was immune to the defense because of his status of trustee.[80] The circuit rejected this argument and noted that the trustee's standing was based on 11 U.S.C. § 541, and section 541 placed "both temporal and qualitative limitations on the reach of the bankruptcy estate."[81] Because the trustee's standing arose from section 541 and he stepped into the shoes of the debtor, he could not "use his status as trustee to insulate the [debtor corporation] from the wrongdoing."[82] It is unclear from this decision whether the Circuit considers *in pari delicto* a component of standing or an affirmative defense.

The Court concludes that Defendants can raise the *in pari delicto* doctrine at this time. As noted above, the *in pari delicto* doctrine can be a component of standing. It is unsettled whether *in pari delicto* is solely an affirmative defense and therefore must be pled as such.[83] Furthermore, the result is the same whether *in pari delicto* is a defense or a component of standing.

As noted above, the *in pari delicto* doctrine precludes a trustee from bringing suit on behalf of a debtor corporation against a third party if the debtor corporation's officers engaged in the fraud with that third party. There are, however, exceptions to the *in pari delicto* doctrine. First, the adverse interest exception to the *in pari delicto* doctrine provides that fraudulent conduct will not be imputed

---

[79] 84 F.3d at 1281.

[80] *Id.* at 1284.

[81] *Id.* at 1285.

[82] *Id.*

[83] Because standing could encompass the *in pari delicto* doctrine, and Defendants raised standing as affirmative defense in their Answer, the Court concludes that it can address the doctrine on a Motion for Judgment on the Pleadings.

to the corporation if the officer's interests were adverse to the corporation and not for the benefit for the corporation.[84] As noted above, in the Second Amended Complaint, the Trustee alleges that the individual Defendants made misrepresentations and concealed facts from GRHC and others. The Trustee relies on the adverse interest exception and argues that the individual Defendants' fraud should not be imputed to GRHC because the individual Defendants' conduct was adverse to GRHC.

Second, there is the sole actor exception, which provides that if an agent is the sole representative of a principal, then that agent's fraudulent conduct will be imputed to the principal regardless of whether the agent's conduct was adverse to the principal's interest.[85] "The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability."[86] Thus, the individual Defendants, as the sole representatives of GRHC, contend that their allegedly fraudulent conduct should be imputed to GRHC because the individual Defendants were the sole members of GRHC.

Taking the Second Amended Complaint as true, we can assume the individual Defendants engaged in wrongful conduct. Notwithstanding that the individual Defendants could not have defrauded themselves, the Trustee stands in the shoes of the debtor and can take no greater rights than GRHC. A bankruptcy trustee is not immune to the doctrine of *in pari delicto*. Thus, the individual Defendants' fraud is imputed to GRHC because they were the sole members of GRHC.[87]

---

[84] *Thabault v. Chait*, 541 F.3d 512, 527 (3rd Cir. 2008).

[85] *Id.*

[86] *Lafferty*, 267 F.3d at 359.

[87] The irony is not lost that the *in pari delicto* doctrine is based on equitable principals, and the individual Defendants are imputing their fraud onto their corporation to prevent the corporation from bringing fraud claims against them. However, "a trustee in bankruptcy is [not] immune to *in pari delicto* and other defenses based on the debtor's

As a result, the Trustee, standing in the shoes of GRHC, cannot bring the fraud claims against the individual Defendants. Accordingly, the Court grants Defendants' Motion for Judgment on the Pleadings on Counts 2, 3, and 4.

### 2. Equitable Reformation Claim (Count 11)

The Trustee's equitable reformation claim seeks to reform the Lookout Windpower Amended and Restated Operating agreement, the Lookout Windpower Development agreement, and the Lookout Windpower Redemption agreement. The Trustee alleges that these documents should be reformed to name GRHC as the developer instead of LWHC. Defendants contend that if the fraud claims are dismissed, the Trustee's equitable reformation claim must be dismissed as well because equitable reformation is only available in cases based on fraud.[88]

Generally, "[c]ontract reformation is an equitable remedy available to correct mutual mistakes of fact or fraud."[89] "Reformation is an ancient remedy used to reframe written contracts to reflect accurately the real agreement between contracting parties when, either through mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party, the writing does not embody the contract as actually made."[90] Courts exercise reformation with great caution

---

misconduct." *Mosier*, 546 F.3d at 1277. *See also In re Hedged-Investments Assocs.*, 84 F.3d at 1285-86 ("To be sure, [the Trustee] articulates sound reasons why it might be wise to allow an exception to this rule in cases, such as this one, where the trustee's efforts stand to benefit hundreds of innocent investors. However, to paraphrase the Supreme Court, the issue is not whether such an exception would make good policy but whether the exception can be found in the Bankruptcy Code.")

[88] When the Trustee filed his Motion for Leave to Amend Complaint, he sought to remove his equitable reformation/rescission claim.  Doc. 175. The Court denied this motion, and the Trustee apparently intends to continue pursuing the claim. Although the Trustee includes rescission as a remedy in the Complaint, the Trustee does not argue for rescission of the documents but instead only argues for reformation. Accordingly, the Court will proceed on that basis.

[89] *Liggatt v. Employers Mut. Cas. Co.*, 273 Kan. 915, 926, 46 P.3d 1120, 1128 (2002).

[90] *Mutual of Omaha Ins. Co. v. Russell*, 402 F.2d 339, 344 (10th Cir. 1968) (citations omitted).

because it is such an extraordinary remedy.[91]

The fraud claims no longer remain in this case, so there is no fraudulent conduct for the Trustee to rely upon to reform the documents. Furthermore, although the Trustee argues that reformation is available in the case of unilateral mistake, there are no allegations of mistake in the Second Amended Complaint. Finally, GRHC is not a party to the documents that the Trustee seeks to reform. Instead, the agreements are between LWHC and Edison. The Trustee, standing in the shoes of GRHC, has no basis to reform the documents. As such, the Court grants Defendants' Motion for Judgment on the Pleadings on Count 11.

### 3. *Fraudulent Transfer Claims (Counts 5 - 10)*[92]

The Trustee brings fraudulent transfer claims pursuant to K.S.A. § 33-201, *et. seq*, Kansas's Uniform Fraudulent Transfer Act.[93] As noted above, the Trustee alleges that GRHC's members used GRHC's resources to identify the Lookout and Forward development opportunities and began development of those projects. The Trustee then contends that GRHC's members fraudulently transferred those development and redemption opportunities to other companies owned by the members.

Defendants argue that there are no allegations that GRHC was the owner of any interest in the Forward or Lookout Windpower opportunities. Thus, Defendants assert that because there are

---

[91] *Id.*

[92] These claims are:  (5) fraudulent transfer of the Lookout Development opportunity; (6) fraudulent transfer of the Lookout Redemption opportunity to LWHC-PA; (7) fraudulent transfer of the Lookout Redemption opportunity to LWHC-MO; (8) fraudulent transfer of the Forward Development opportunity; (9) fraudulent transfer of the [Forward] Redemption opportunity to FWHC-PA; and (10) fraudulent transfer of the Forward Redemption opportunity to FWHC-MO.

[93] The Trustee's fraudulent transfer claims are brought pursuant to the Kansas Uniform Fraudulent Transfer Act, and they are not brought pursuant to the Bankruptcy Code. Neither party discusses the distinction.

no allegations that GRHC owned an interest in those opportunities, there is an absence of any transaction that could constitute a fraudulent transfer. Defendants contend that the Trustee has merely pled that the individual Defendants usurped from GRHC the Forward and Lookout windpower opportunities rather than pled that the individual Defendants fraudulently transferred the opportunity away from GRHC. Accordingly, they argue that the Trustee's fraudulent-transfer claims should be dismissed because they are not fraudulent transfer claims.[94]

On a motion for judgment on the pleadings, the Court must take the factual allegations as true. And the Trustee alleges that GRHC began development of the Lookout and Forward windpower projects and that GRHC identified those windpower projects as GRHC's projects to the public. After identifying the development opportunities as their own, the Trustee alleges that GRHC's members then transferred these opportunities to other companies owned by the members of GRHC. Specifically, the Trustee alleges, in at least one instance, that the "Insiders transfer[red], dispose[d], or otherwise cause[d] GRHC to part with GRHC's interest, investment, expectation and opportunity to complete development of the LW project [and FW project] and receive payment therefore."[95] This allegation fits with K.S.A. § 33-201 which defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[96]

---

[94] In a separate motion, Defendants contend that GRHC's Operating Agreement allowed for the Defendants to usurp these corporate opportunities. The Court addresses this motion elsewhere in this Order *See infra* Section IV.

[95] *See* Second Amended Complaint, ¶ 211. Arguably, this is merely a legal conclusion. However, the Court finds that there are sufficient facts to support this allegation.

[96] K.S.A. § 33-204 provides the framework to determine whether the transfer was fraudulent.

Defendants chose to bring their motion as one on the pleading, and the Court must consider the allegations in the Second Amended Complaint. The Court finds that there are enough facts in the 100-page Second Amended Complaint to plausibly state fraudulent-transfer claims. Accordingly, the Court denies Defendants' Motion for Judgment on the Pleadings with respect to Counts 5 through 10, the fraudulent-transfer claims.

In sum, the Court grants in part and denies in part Defendants' Motion for Judgment on the Pleadings. The Court grants the Motion with respect to Counts, 2, 3,4 and 11. The Court denies the Motion with respect to Counts 5 through 10.

## IV.  Individual Defendants' Motion for Summary Judgment on Corporate Opportunity Claims in Count I (Doc. 147)

### A.  Factual Background

GRHC is a Delaware limited liability company formed on February 8, 2002. GRHC's Operating Agreement governs GRHC. Specific provisions in GRHC's Operating Agreement will be discussed in more detail in the analysis section.

The Trustee's first count in the Complaint against the individual Defendants, members of GRHC, is a breach of fiduciary duty claim. The Trustee alleges that the individual Defendants breached their duty to GRHC in numerous ways, including depriving and usurping GRHC's opportunity to develop the Lookout Windpower and Forward Windpower projects. The Individual Defendants seek partial summary judgment on this claim.[97]

---

[97] Defendants assert that they only seek dismissal of the corporate opportunity claims, and not the other claims, if any, which may remain in Count 1.

-33-

### B. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[98] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[99] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[100] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[101]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[102] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[103] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[104] Conclusory allegations alone cannot defeat a properly supported motion

---

[98] Fed. R. Civ. P. 56(a).

[99] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[100] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[101] *Id.* (citing *Celotex*, 477 U.S. at 325).

[102] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[103] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[104] *Adler*, 144 F.3d at 671.

-34-

for summary judgment.[105]

### C. Analysis

The individual Defendants argue that the Trustee, standing in the shoes of GRHC, can only assert breach of fiduciary duty claims as GRHC might, subject to GRHC's Operating Agreement. GRHC's Operating Agreement contains a provision allowing for the members of GRHC to take, for its own, opportunities without presenting them to GRHC. As such, the individual Defendants contend that the Operating Agreement precludes GRHC's breach of fiduciary duty claim based on the taking of the Lookout Windpower or Forward Windpower opportunities.

Initially, the parties disagree about which state's law applies. The Operating Agreement provides that the Agreement "shall be governed by the laws of the State of Kansas."[106] The Trustee argues that this provision should be enforced. Defendants, however, argue that Delaware law applies because by the election of Kansas law in the Operating Agreement, the entire body of law controlling within Kansas applies. And K.S.A. § 17-76,120 provides that the law of the state under which a LLC is organized controls liability of members and managers. Because GRHC was organized in Delaware, Defendants contend that Delaware law applies to their internal affairs.

Kansas courts generally give effect to contractual choice of law provisions.[107] Because the Agreement designates Kansas as the choice of law state, the Court will apply Kansas law. Defendants seek the Court's interpretation of a contractual provision in the Operating Agreement and how it relates to the governing law. The Court notes, however, that the choice of law issue is

---

[105] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[106] Doc. 148-1, GRHC's Operating Agreement, § 10.9.

[107] *Brenner v. Oppenheimer & Co., Inc.*, 273 Kan. 525, 539, 44 P.3d 364, 375 (2002).

-35-

largely irrelevant as Kansas and Delaware law are similar with respect to this issue.

Kansas law provides that a limited liability company's operating agreement may expand, restrict, or eliminate a member or manager's duties, including fiduciary duties.[108] Specifically, K.S.A. § 17-76,134(b) provides that Kansas law will give maximum effect to the freedom of contract and the enforceability of operating agreements. Furthermore, a member acting under an operating agreement will not be liable to the company for his "good faith reliance on the provisions of the operating agreement."[109]

GRHC's Operating Agreement, Section 5.3 provides:

Any member may engage in or possess an interest in other business ventures of every nature and description, independently or with others, whether or not similar to or in competition with the business of the Company, and neither the Company nor the Members shall have, by virtue of this Agreement or any law, any right in or to such other business ventures or to any ownership or other interest in or the income or profits derived therefrom. No Member shall be obligated to present any particular investment or business opportunity to the Company even if such opportunity is of a character which, if present to the Company, could be taken by the Company, and each Member shall have the right to take for its own account and with others or to recommend to others any such opportunity.

Defendants contend that GRHC's Operating Agreement is valid under either Kansas or Delaware law, and because of this provision, the individual Defendants were under no obligation to present any corporate opportunity to GRHC and could take the Lookout Windpower and Forward Windpower opportunities for their own benefit. Accordingly, Defendants argue that the Trustee's breach of fiduciary duty claim against them based on a usurpation of a corporate opportunity must fail.

---

[108] *See* K.S.A. § 17-76,134.

[109] *Id*. at § 17-76,134(c)(1).

The Trustee argues that Section 5.3 is invalid. However, the Trustee's argument that Kansas's overriding fairness concept would not allow fiduciaries to benefit from restrictions in an operating agreement is contrary to Kansas law. Kansas Statute Annotated § 17-76,134(c)(2) specifically allows members of a limited liability company to restrict their duties in an operating agreement. In this case, the Operating Agreement did just that and provided that its members could take opportunities for their own that could be taken by GRHC.

Next, the Trustee argues that section 5.3 is irreconcilable with section 6.1 of the Operating Agreement. Section 6.1 provides:

> To the extent permitted by law, a Member and/or a Member's officers, directors, partners, members, employees and agents shall not be liable for damages or otherwise to the Company for any act, omission or error in judgment performed, omitted or made by it or them in good faith and in a manner reasonably believed by it or them to be within the scope of authority granted to it or them by this Agreement and in the best interests of the Company, provided that such act, omission or error in judgment does not constitute fraud, gross negligence, willful misconduct or breach of fiduciary duty.

The Trustee contends that if Defendants truly intended to restrict their liability so that they could abstain from their fiduciary duties to GRHC, they would not have included the final sentence of section 6.1. Defendants disagree and contend that it is not uncommon to renounce a corporate opportunity yet still retain a general obligation not to breach fiduciary duties.

The Court agrees with Defendant that these provisions are not in conflict, and the members retained a general obligation to not breach a fiduciary duty. The provision in GRHC's Operating Agreement allowing the members to take an investment or business opportunity, even if the opportunity is one which would have been of the character that could be taken by GRHC, was not in violation of Kansas law because Kansas allows members of a limited liability company to restrict or expand their duties. Section 5.3 delineated that the members could take opportunities as their

own. Consequently, because GRHC's Operating Agreement allowed for the individual members to take opportunities for themselves, the individual Defendants could not have breached a fiduciary duty to GRHC if they took such opportunities. Therefore, the Trustee's claim for breach of fiduciary duty against the individual Defendants for usurping of a corporate opportunity fails. Accordingly, the Court grants the Individual Defendants' motion for partial summary judgment on Count 1.[110]

### V.  FreeStream's Motion for Summary Judgment (Doc. 183)

#### A.  Factual Background

FreeStream and GRHC entered into an Advisory Services Agreement in February of 2005.[111] In this Agreement, GRHC hired FreeStream to provide advice and prepare an investment memorandum that was to be used to sell the StonyCreek wind farm project. FreeStream agreed to "review and provide recommendations and comments to [GRHC][112] regarding all material agreements related to the development and construction of the project and ownership of the project company."[113] If requested by [GRHC], FreeStream agreed to provide such assistance "beyond merely reviewing and commenting on such documents," and it "would include active involvement in efforts to complete a final agreement . . . ."[114] The Advisory Services Agreement expressly provided that "FreeStream's role herein is that of an independent contractor; nothing is intended to

---

[110] The Court notes that a portion of Count 1 remains because Defendants only sought dismissal of the corporate opportunity claims in Count 1. Accordingly, the Court only dismisses the breach of fiduciary claims based on the usurpation of a corporate opportunity.

[111] *See* Doc. 184-1, Advisory Services Agreement.

[112] The Advisory Services Agreement provided that the "Client" was GRHC and Stonycreek Windpower, LLC. The Court inserts GRHC in brackets to indicate that the original language provided "Client."

[113] Doc. 184-1, Advisory Services Agreement, § 1.2.

[114] *Id.*

create or shall be construed as creating a fiduciary relationship between [GRHC] and FreeStream."[115]

In the Second Amended Complaint, the Trustee asserts that FreeStream breached its fiduciary duty to GRHC by permitting the Stonycreek deal to go through with the "switched" Developer name, i.e., by allowing LWHC to be named as the developer in the subsequent agreements instead of naming GRHC as the developer. The Trustee alleges that FreeStream knew that GRHC was the developer of the projects, but it participated in the plan to switch the developer's identity and keep the profits from the windpower projects for themselves. FreeStream seeks summary judgment on this claim.

### B. Analysis

FreeStream contends that the Trustee cannot establish that a fiduciary relationship existed between FreeStream and GRHC because the Advisory Services Agreement expressly disavows such a relationship. The Trustee summarily argues that although the parties had a written agreement disavowing a fiduciary relationship, the facts demonstrate that FreeStream consciously assumed a duty because (1) GRHC sought FreeStream's advice, (2) GRHC had discussions with FreeStream concerning the agreements, and (3) FreeStream served as GRHC's financial advisor.[116]

"A 'fiduciary relationship' is any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party."[117] Generally, Kansas law will recognize an implied-

---

[115] *Id.* at § 9.

[116] Many of the facts asserted by the Trustee in support for this position were irrelevant.

[117] *Edwards & Assocs., Inc. v. Black & Veatch, L.L.P.*, 84 F. Supp. 2d 1182, 1198 (D. Kan. 2000) (citing *Brown v. Foulks*, 232 Kan. 424, 430-31, 657 P.2d 501 (1983)).

in-law fiduciary relationship if the surrounding circumstances support one.[118] However, a party "may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary."[119] The "conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law."[120]

In this case, there is no evidence that FreeStream consciously or deliberately assumed the responsibility of a fiduciary. Rather, the Advisory Services Agreement explicitly disavows a fiduciary relationship because it states that "nothing is intended to create or shall be construed as creating a fiduciary relationship between [GRHC] and FreeStream." The Trustee simply does not come forward with any evidence demonstrating FreeStream's conscious assumption of a duty.

Furthermore, a fiduciary relationship requires a party to be in the "position to have and exercise influence over the first party."[121] There is no evidence that FreeStream was in the position to have and exercise influence over GRHC as required for a fiduciary relationship. The Trustee fails to demonstrate that a genuine issue of material facts exists as to whether a fiduciary relationship

---

[118] *Id.*

[119] *Denison State Bank v. Madeira*, 230 Kan. 684, 696, 640 P.2d 1235, 1243-44 (1982).

[120] *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990). Both parties proceed under Kansas law. The Advisory Services Agreement, however, has a choice of law provision designating New York. *See* Doc. 184-1, Advisory Services Agreement, § 8. Although neither party presents an argument under New York law, the Court will briefly dispose of the issue. "Under New York law, parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree." *Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2004). "In certain limited and unusual circumstances there may be special factors that create fiduciary relationships between contracting commercial parties, such as, for example, when one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." *Id.* at 734. In addition, New York recognizes agreements that explicitly disclaim a fiduciary duty relationship, and a fiduciary duty cannot arise if it is specifically disclaimed. *See Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004). The factual circumstances, as stated above, do not support a fiduciary relationship under New York law either.

[121] *See Edwards & Associates*, 84 F. Supp. 2d at 1198 (citing *Brown*, 232 Kan. at 430-31).

existed between the parties. Consequently, the Court grants FreeStream's motion for summary judgment on this claim.

### VI.  FreeStream's Motion for Summary Judgment on Count 11 (Doc. 195)

FreeStream also filed a motion for summary judgment on Count 11, the Trustee's equitable reformation/rescission claim. As noted above with respect to LWHC's Motion for Judgment on the Pleadings on Count 11, the Trustee seeks to reform three agreements to name GRHC as the developer in those agreements instead of LWHC.[122] FreeStream is not a party to those documents.

As noted above with respect to LWHC's motion: "Reformation is an ancient remedy used to reframe written contracts to reflect accurately the real agreement between contracting parties when, either through mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party, the writing does not embody the contract as actually made."[123]

The Trustee provides no evidence that FreeStream participated in fraudulent conduct nor does he even allege in the Second Amended Complaint fraud claims against FreeStream.[124] Furthermore, GRHC is not a party to any of the documents the Trustee seeks to reform. Instead, the agreements are between LWHC and Edison. The Trustee has no basis to reform the documents between LWHC and Edison, and equitable reformation is unavailable.[125] Accordingly, the Court grants FreeStream's Motion for Summary Judgment on this claim.

---

[122] *See supra* Section III(C)(2).

[123] *Russell*, 402 F.2d at 344 (citations omitted).

[124] The Trustee asserts fraud allegations specific to FreeStream for the first time in his response to FreeStream's Motion for Summary Judgment. The Court will not address these allegations because the Trustee did not assert fraud claims against FreeStream in the Second Amended Complaint and because the Court denied his Motion to File an Amended Complaint to include fraud claims against FreeStream.

[125] Equitable reformation of the documents would also have no material effect on FreeStream. Even if the Court reformed the agreements to replace GRHC as the developer, instead of LWHC, the Redemption Agreement provides for a direct payment from Edison to FreeStream. *See supra* Section II(A).

-41-

**IT IS ACCORDINGLY ORDERED** that FreeStream's Motion to Distribute (Doc. 4 in Member Case No. 11-2524) is **GRANTED**. Intrust Bank should wire transfer to FreeStream its amount of the judgment: $2,235,362.11.

**IT IS FURTHER ORDERED** that LWHC's Motion to Distribute (Doc. 9 in Member Case No. 11-2524) is **GRANTED**.

**IT IS FURTHER ORDERED** that certain Defendants' Motion for Judgment on the Pleadings (Doc. 144) is **GRANTED IN PART** and **DENIED IN PART**. It is granted with respect to Counts 2, 3, 4, and 11. It is denied with respect to Counts 5 through 10.

**IT IS FURTHER ORDERED** that the individual Defendants' Motion for Summary Judgment on Corporate Opportunity Claims (Doc. 147) is **GRANTED**.

**IT IS FURTHER ORDERED** that FreeStream's Motion for Summary Judgment on Count 18 (Doc. 183) is **GRANTED**.

**IT IS FURTHER ORDERED** that FreeStream's Motion for Summary Judgment on Count 11 (Doc. 195) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 9th day of April, 2012.

Eric F. Melgren

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE